IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY WILLINGHAM | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | NO. 09-2368 |
| Commissioner of | : | |
| Social Security Administration | : | |

## REPORT AND RECOMMENDATION

THOMAS J. RUETER
Chief United States Magistrate Judge             January 8, 2010

        Plaintiff, Anthony Willingham, filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act").

        Plaintiff filed a Brief and Statement of Issues in Support of Request for Review ("Pl.'s Br."), defendant filed a Response to Request for Review by Plaintiff ("Def.'s Br."), and plaintiff filed a reply thereto ("Pl.'s Reply"). For the reasons set forth below, this court recommends that plaintiff's Request for Review be granted and the case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

### I.     FACTUAL AND PROCEDURAL HISTORY

        Plaintiff filed an application for SSI claiming disability since August 24, 2007 due to bipolar disorder, post traumatic stress disorder, asthma, alcohol and drug abuse, allergies, restless leg syndrome, and insomnia. (R. 94, 120-24, 140-43, 145-55.) The claim was denied initially and a request for a hearing was timely filed. (R. 94-99, 101.) A hearing was held on

May 19, 2008, before Administrative Law Judge ("ALJ") Margaret A. Lenzi. (R. 49-93.) Plaintiff, who was represented by counsel, appeared and testified. Vocational expert ("VE") Sherry Kristal-Turhazky also appeared and testified. In a decision dated May 28, 2008, the ALJ found that plaintiff was not disabled under the Act. (R. 13-32.) The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since August 24, 2007, the application date (20 CFR 416.920(b) and 416.971 et seq.).

2. The claimant has the following severe combination of medically determinable impairments: asthma; bipolar affective disorder; major depressive disorder with psychotic features; substance-induced mood disorder; history of post-traumatic stress disorder; and polysubstance abuse and dependence (20 CFR 416.920(c)).

3. The claimant's impairments, including his substance use disorders, meet sections 12.04 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).

4. If the claimant stopped his substance abuse, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

5. If the claimant stopped his substance abuse, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).

6. If the claimant stopped his substance abuse, the claimant would have the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: he must avoid concentrated or excessive exposure to pulmonary irritants such as dust, odors, fumes, and extremes of temperature; he has sufficient attention and concentration to understand, remember, and follow simple instructions; he can perform routine, repetitive tasks; he is limited to low stress work, defined as involving only occasional decision-making and only occasional changes in the work setting; and he can tolerate only occasional interaction with the general public.

7. If the claimant stopped his substance abuse, the claimant would be unable to perform past relevant work (20 CFR 416.965).

8. The claimant was born on April 22, 1959, and was thus 48 years old, which is defined as a younger individual age 45-49, on the date the application was filed, August 24, 2007; he is currently 49 years old, in the same age category (20 CFR 416.963).

9. The claimant has a high school education and two years of college, and he is able to communicate in English (20 CFR 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. If the claimant stopped his substance abuse, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 416.960(c) and 416.966).

12. Because the claimant would not be disabled if he stopped his substance abuse (20 CFR 416.920(g)), the claimant's substance use disorders are a contributing factor material to the determination of his disability (20 CFR 416.935). Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time from the date the application was filed through the date of this decision.

(R. 19-32.)

Plaintiff filed a request for review of the decision of the ALJ that was denied by the Appeals Council on March 27, 2009. (R. 1-6, 9-12.) The ALJ's decision became the final decision of the Commissioner. Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The role of this court on judicial review is to determine whether there is

substantial evidence in the record to support the Commissioner's decision. Jesurum v. Sec'y of United States Dep't of Health and Human Serv., 48 F.3d 114, 117 (3d Cir. 1995). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Substantial evidence is more than a mere scintilla of evidence, but may be less than a preponderance of the evidence. Jesurum, 48 F.3d at 117. This court may not weigh evidence or substitute its conclusions for those of the fact-finder. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002) (citing Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993)). As the Third Circuit stated, "so long as an agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse . . . those findings." Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1191 (3d Cir. 1986).

To be eligible for benefits, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). Specifically, the impairments must be such that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

Under the Act, the claimant has the burden of proving the existence of a disability and must furnish medical evidence indicating the severity of the impairment. 42 U.S.C. § 423(d)(5). A claimant satisfies this burden by showing an inability to return to former work.

Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979). Once this standard is met, the burden of proof shifts to the Commissioner to show that given the claimant's age, education, and work experience the claimant has the ability to perform specific jobs that exist in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.920(f).

The Commissioner decided this matter by utilizing the five step sequential evaluation process established by the Department of Health and Human Services to determine whether a person is "disabled." This process requires the Commissioner to consider, in sequence, whether a claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment which meets or equals the requirements of a listed impairment; (4) can perform past relevant work; and (5) if not, whether the claimant is able to perform other work, in view of his age, education, and work experience. 20 C.F.R. § 416.920.

### III. BACKGROUND

#### A. Administrative hearing, May 19, 2008

##### 1. Testimony of plaintiff

At the administrative hearing, plaintiff, accompanied by his counsel, appeared and testified. (R. 51.) At the time of the hearing, plaintiff was forty-nine years old. (R. 55.) Plaintiff resided at Fresh Start, a transitional housing program for veterans who are recovering from addiction. Id. Before moving to Fresh Start, plaintiff lived with his common law wife and son. (R. 56.) Plaintiff stated that he no longer lived with his wife because she abused drugs. Id.

Plaintiff testified that he was incarcerated for eleven years for arson, aggravated assault, and reckless endangerment. (R. 57, 60.) While incarcerated, plaintiff completed two years of a college education. (R. 57, 60-61.) Plaintiff stated that he got into a lot of fights while

in prison and spent a "lot of time in the hole." (R. 61.) Plaintiff was released from prison in 2005. (R. 63.)

With respect to his work history, plaintiff has worked in numerous establishments as a cook. (R. 57.) Plaintiff explained that it is difficult for him to work as a cook, because the heat, steam and chemicals aggravate his asthma symptoms. (R. 57-58.) Plaintiff explained his difficulty working in a professional kitchen:

> On a couple of occasions, my employer had to take me to Abington Hospital because, especially when the summer comes in, I can't breathe back there. I lose all my air. But, also, what happens a lot of time, in that line of work, you're moving around really fast, and I'm like a bull in a china shop when I go into – and now that I understand what's going on [INAUDIBLE] at other times, a manic stage, just like a rabbit running around. And I'll do that all day, come home at night, 12, 1:00 at night, and stay up half the damn night, sleep maybe an hour, if that, turn around, go right back to work. This pattern goes on. You know, I may do this for six to seven days, and then finally, with no sleep, crash. But I can – I'm real irritable and nasty, and the temper – the problem comes out, and I go in a rage. If I don't go in the rage, I won't – I'll be the first to tell you, I'll never deny it, I have a serious alcohol and cocaine problem. I'll drink or use. And if I don't drink or use, I'm probably going to strike out at somebody.

(R. 58.) Prior to his period of incarceration, plaintiff was employed by SEPTA as a traffic controller. (R. 58.) Since he left prison, plaintiff has primarily worked as a cook, but also worked for a guitar manufacturer. (R. 57.) Plaintiff was fired from the guitar technician position for failing to report to work. (R. 70.)

When asked by the ALJ for the reason he is unable to work, plaintiff testified that he was "too unstable" and that when he works, he "go[es] into a mania." (R. 59.) In response to questioning from his attorney, plaintiff explained that when he worked at a delicatessen, he worked long hours at a time and would become manic, with racing thoughts. (R. 67-68.) Plaintiff testified that he was fired from that job because he failed to report to work. (R. 69.)

6

Plaintiff stated that after feeling manic, he typically gets very tired and depressed and does not get out of bed. (R. 69.) Plaintiff also testified that he was fired from a position at a bakery. (R. 71.) With respect to his termination from that job, plaintiff testified that he became depressed and began using cocaine. (R. 71.) Plaintiff stated, "[a] lot of times when I'm feeling down I use. That's what it is, to be honest." Id.

The ALJ noted that plaintiff stabilizes after a hospitalization following a drug and alcohol binge, and questioned plaintiff about his status when he leaves the hospital. (R. 60.) Plaintiff testified:

> Ma'am, I wish I could explain it. Maybe if I could explain it a little bit, it wouldn't be happening, you know. But a lot of times, I, I'm okay for a while, then I just start going down. I just get in a depression hitch. A lot of times, you know – I really don't – not comfortable with talking about it, but the other side of it is, too, some things happened. And when I start thinking about them, I, I just shut down. I don't want to be around, I don't want to be around nobody, especially man [sic]. I had a bad experience.

(R. 60.) Plaintiff testified that he attended group counseling sessions several times per week at Fresh Start, met with a therapist once per week, and saw his psychiatrist twice per month. (R. 61, 63, 85.) Plaintiff attended Alcoholics Anonymous meetings five times per week and had a sponsor. (R. 85.) Plaintiff acknowledged that when he is not compliant with his medication, he starts drinking and heavily using drugs. (R. 62.) Plaintiff testified that "I'm trying to stay on my meds now." (R. 62.) When compliant with his medication, plaintiff stated that he feels calmer and "I don't seem like I could get so crazy. Voices stop, calm down." (R. 62.) Plaintiff explained that he almost lost his life in his most recent suicide attempt. Id. Since he left prison in 2005, plaintiff's longest period of sobriety from drugs and alcohol was "probably three months," or perhaps four or five months in 2007. (R. 63.)

7

The ALJ noted that the record revealed that plaintiff was in and out of treatment with the VA and questioned plaintiff as follows:

> Q: Do you feel any different when you're not using drugs and alcohol for any period of time?
> A: As long as I stay on my meds, I'm okay.
> Q: So, if you, if you're not using for a period of time and you're on your meds, you say you feel okay? What does that mean?
> A: I didn't say I felt okay.
> Q: Okay.
> A: – I'm not using drugs, it usually is because I'm on my meds.
> Q: Oh, okay. So, how, how is – how, how do you feel when you're not using and you're on your meds?
> A: I feel better.
> Q: In what way?
> A: I don't know how to describe it. I feel – you know, I – at times I'm not so – I still have ups and downs, but the peaks and valleys ain't so bad. They're not as bad as, you know – they are what they are. I'm not perfect. I just don't feel like killing myself. If you – if that's what you want to hear, that's what it is. I just don't – the only, the only difference is I ain't got a knife slicing up my arm like this, or I ain't got a whole bottle of pills, taking them down.

(R. 64-65.) Plaintiff's attorney asked plaintiff whether he felt better when he is in treatment. (R. 73.) Plaintiff replied that "[t]he only thing I said is I don't feel like hurting myself when I'm [in treatment.]" (R. 74.) Plaintiff feels best when he is not suicidal. (R. 74.) Plaintiff was sober for the month and a half prior to the administrative hearing in May 2008. (R. 74.) However, he was admitted to the VA in March and April 2008 because he was suicidal. (R. 74.) During the administrative hearing, plaintiff testified that he was having racing thoughts then and that they typically occur throughout the day. (R. 76.) Plaintiff testified that his depression and manic symptoms do not go away even when he is on medication. (R. 78.) Plaintiff has difficulty sleeping, despite medication, and will typically have two sleepless nights per week. (R. 79-81.)

Plaintiff testified that his temper is "ridiculous" and that, at times, he goes into a

8

rage and has hurt people. (R. 57.) Plaintiff explained that during the week prior to the hearing, he was in an altercation with another resident of Fresh Start. (R. 76-77.) Plaintiff has problems with his temper "pretty frequent[ly]." (R. 77.) For example, he attacked a co-worker with a knife while employed at a restaurant. (R. 77.)

With respect to his asthma, plaintiff testified that he uses a nebulizer three times a day and he uses two different types of inhalers. (R. 65.) He recently was prescribed a steroid because he was having trouble with his asthma symptoms. Id. Plaintiff explained that he had asthma as a child, but that it had worsened over the last three years. Id. Plaintiff stated, "that's part of the reason I was discharged from the Marine Corps, because of the asthma." (R. 65-66.) In addition, plaintiff testified that he does not have problems standing or sitting, but on very hot days or extremely cold days, walking is difficult because he becomes short of breath. (R. 66.)

### 2. Testimony of Vocational Expert

The ALJ posed several hypothetical questions to VE Sherry Kristal-Turhazky. (R. 88-90.) The VE described plaintiff's past work as a baker as skilled, heavy work. (R. 88.) Plaintiff's past work as a cook is classified as skilled, medium level work. (R. 89.) His past work as a train dispatcher is skilled, sedentary work. Id. The ALJ asked the VE to consider a hypothetical individual, forty-six to forty-nine years old, with the training, education and experience of plaintiff, who could perform all jobs at all exertional levels, but who should avoid concentrated and excessive exposure to pulmonary irritants such as dust, odors, fumes and extremes in temperatures, who would have sufficient attention and concentration to understand, remember, and follow simple instructions and perform routine and repetitive tasks. Id. The ALJ further qualified that the work should be performed in a low-stress setting, defined as only

occasional decision making or occasional changes in the work setting, with no more than occasional interaction with the general public. Id. The VE opined that such an individual could not perform plaintiff's past relevant work, but that such an individual could perform the work of an assembler of electrical accessories, assembler of plastic hospital equipment, document preparer, or assembler of optical frames. (R. 89-90.) For the electrical accessories assembler position, there are approximately 2,000 positions in the regional economy (120,000 nationally), for the assembler of plastic hospital equipment position there are approximately 230 positions in the regional economy (300,000 nationally), for the document preparation position there are approximately 1,500 positions in the regional economy (170,000 nationally), and for the assembler of optical frames position, there are approximately 1,600 jobs in the regional economy (200,000 nationally). (R. 90.)

## IV. DISCUSSION

The ALJ found that the evidence of record supports a finding that plaintiff had the following severe impairments: asthma, bipolar affective disorder, major depressive disorder with psychotic features, substance-induced mood disorder, history of post-traumatic stress disorder, and polysubstance abuse and dependence. (R. 20.) The ALJ also found that plaintiff's impairments, including his substance abuse disorders, meet sections 12.04 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1. Id. The ALJ further found that if plaintiff stopped his substance abuse, plaintiff would continue to have a severe impairment or combination of impairments, but that his impairments would not meet or medically equal any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (R. 20-21.) Ultimately, the ALJ concluded that plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at

all exertional levels, but must avoid concentrated or excessive exposure to pulmonary irritants such as dust, odors, fumes, and extremes of temperature; he has sufficient attention and concentration to understand, remember and follow simple instructions; he can perform routine, repetitive tasks; he is limited to low stress work, defined as involving only occasional decision-making and only occasional changes in the work setting; and he can tolerate only occasional interaction with the general public. (R. 21.) Plaintiff contends that substantial evidence does not support the ALJ's decision. Specifically, plaintiff avers that the ALJ failed to consider his diagnosed personality disorder, erred in finding that plaintiff's polysubstance abuse disorder was a factor material to the finding of disability, failed to properly weigh the medical opinions of plaintiff's treating physicians, and erred in failing to consult a medical expert. (Pl.'s Br. at 7-27.) Defendant maintains that substantial evidence supports the decision of the ALJ. (Def.'s Br. at 2-15.)

### A. ALJ failed to consider evidence of personality disorder

Plaintiff argues that the ALJ erred as a matter of law in failing to consider all of the medical evidence, particularly evidence of plaintiff's diagnosed personality disorder. (Pl.'s Br. at 7-14.) Plaintiff notes that the record contains evidence of six suicide attempts, three of which occurred subsequent to plaintiff's application for SSI in August 2007, homicidal thoughts, and a lack of anger control. Id. at 8-9.

The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 32 (4th ed. 2000) ("DSM-IV") defines a personality disorder as an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and

11

leads to distress or impairment. (DSM-IV at 685.) There are ten specific personality disorders, including borderline personality disorder. Id. According to the DSM-IV, personality disorders are assessed on Axis II and are grouped into three clusters based on descriptive similarities. Id. at 28-29, 685-86. Borderline personality disorder is a Cluster B personality disorder. Id. The diagnostic criteria for borderline personality disorder are:

> [A] pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:
>
> (1) frantic efforts to avoid real or imagined abandonment
> (2) a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation
> (3) identity disturbance: markedly and persistently unstable self-image or sense of self
> (4) impulsivity in at least two areas that are potentially self-damaging (e.g., spending, sex, substance abuse, reckless driving, binge eating)
> (5) recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior
> (6) affective instability due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days)
> (7) chronic feelings of emptiness
> (8) inappropriate, intense anger or difficulty controlling anger (e.g., frequent displays of temper, constant anger, recurrent physical fights)
> (9) transient, stress-relate paranoid ideation or severe dissociative symptoms

Id. at 710.

As plaintiff points out in his Brief, the record contains evidence that plaintiff has been diagnosed with personality disorder and makes reference to personality disorder traits. Inpatient treatment notes from the VA include a June 16, 2006 diagnosis by Stanley N. Caroff,

M.D., of "poly drug abuse, adj[ustment] disorder with depressed mood, pers[onality] dis[order] [not otherwise specified]" and rule out post traumatic stress disorder. (R. 536.) On December 30, 2006, Kate Blumner, M.D., noted, inter alia, "cluster B traits" on Axis II. (R. 503.) In treatment notes from the VA dated April 8, 2008, Gregg E. Gorton, M.D., described his impression of plaintiff as "a man with probable borderline psychological structure marked by inner emptiness, rejection sensitivity, frantic efforts to avoid abandonment, and identity diffusion, with an 'as if' tendency (chameleon-like ability to 'pretend' on the surface that things are better than they really are for him)." (R. 418.) Treatment notes from the VA reveal that on April 11, 2008, Susan E. Rushing diagnosed plaintiff with suicidal ideation with bipolar disorder and depression with adjustment disorder. (R. 408.) This treatment note also states that plaintiff "has Cluster B traits (including histrionic, narcissistic, antisocial and borderline traits) with likely Borderline Personality disorder." Id. An evaluation prepared by Dr. Rushing on April 14, 2008 reiterated that plaintiff "has Cluster B traits (including histrionic, narcissistic, antisocial and borderline traits) with likely Borderline Personality disorder." (R. 398.) Subsequently, on April 16, 2008, Dr. Gorton opined that plaintiff was a "traumatized, personality-disordered man with several recent losses, and addictive disease, but who is making progress in terms of divulging some of the 'toxic' psychological issues that fuel his self-destructiveness." (R. 390.)

The Third Circuit has explained that, in determining whether plaintiff's impairment matches, or is equivalent to, one of the listed impairments, the ALJ must set forth the reasons for his or her decision. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118-19 (3d Cir. 2000); Caruso v. Comm'r of Soc. Sec., 99 Fed. Appx. 376, 379 (3d Cir. 2004) (not precedential). However, in doing so, the ALJ is not required to use magic language or to adhere

to a particular analytical format. Caruso, 99 Fed. Appx. at 379. Nevertheless, the ALJ must provide not only an expression of the evidence she considered which supports the result, but also some indication of the evidence which was rejected. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Id. "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting this evidence." Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001). See also Johnson v. Comm'r of Soc. Sec. Admin., 529 F.3d 198, 204 (3d Cir. 2008) (the ALJ may not reject pertinent or probative evidence without an explanation).

Although the ALJ is not required to explicitly discuss every report in the record, see Mays v. Barnhart, 227 F. Supp. 2d 443, 449 (E.D. Pa. 2002), in the present case it is unclear from her decision whether the ALJ considered all of the probative evidence of record in rendering her decision. The diagnoses of personality disorder are pertinent and probative evidence. The record contains numerous references to personality disorder and it is unclear whether the ALJ considered this impairment and rejected it, or failed to consider it.

The court is unpersuaded by defendant's argument that plaintiff's "borderline" personality disorder would not have changed the ALJ's decision because plaintiff failed to raise borderline personality disorder as an impairment. The fact that a possibly impaired claimant does not list a condition in an application for benefits is not conclusive that he does not suffer from such impairment. McShea v. Schweiker, 700 F.2d 117, 119 (3d Cir. 1983) (finding that ALJ had a duty to develop a full and fair record and that although plaintiff did not list alcoholism as one of his disabling conditions, Commissioner was not excused from analyzing that

condition). Furthermore, as plaintiff points out, Social Security regulations provide that the Commissioner "will consider only impairment(s) you say you have <u>or</u> <u>about</u> <u>which</u> <u>we</u> <u>receive</u> <u>evidence</u>." 20 C.F.R. § 416.912(a) (emphasis added).

This court, therefore, recommends that the case be remanded for proper consideration by the Commissioner of the evidence regarding plaintiff's diagnoses of personality disorder. See <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 42 (3d Cir. 2001) ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided."). The court notes that the Commissioner may well reach the same conclusion; however, in the absence of sufficient indication that the Commissioner considered all of the evidence in the case and applied the correct legal standards, this court cannot satisfy its obligation to determine whether substantial evidence supports the Commissioner's decision. See <u>Terwilliger v. Chater</u>, 945 F. Supp. 836, 844 (E.D. Pa. 1996) (remanding case in the absence of sufficient indication that the Commissioner considered all of the evidence).

Plaintiff also argues that the ALJ erred in determining that plaintiff's substance abuse was a contributing factor material to the finding of disability. (Pl.'s Br. at 14-24.) Pursuant to the Commissioner's regulations, if a plaintiff is found to be disabled and there is evidence of drug addiction or alcoholism, the Commissioner must determine whether the drug addiction or alcoholism is a contributing factor material to the determination of disability. 20 C.F.R. § 416.935(a). The regulations further provide that the key factor to be examined in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether a plaintiff would still be found disabled if he stopped using

15

drugs or alcohol. 20 C.F.R. § 416.935(b)(1). According to 20 C.F.R. § 416.935(b)(2), the Commissioner will evaluate which physical and mental limitation(s) would remain in the absence of substance abuse. The Commissioner will then determine whether any or all of the remaining limitations would be disabling. Id.

In the present case, this analysis is impacted by ALJ's apparent failure to consider personality disorder in her decision. It is unclear from her decision if the ALJ considered borderline personality disorder in the materiality determination. The ALJ's failure to properly consider the evidence regarding a diagnosis of personality disorder impacted, or may impact, the ALJ's analysis of the materiality determination under 20 C.F.R. § 416.935. The court cannot determine if the ALJ considered borderline personality disorder as a limitation which would remain in the absence of substance abuse. In light of the court's recommendation supra that the case be remanded to the ALJ for further consideration of plaintiff's diagnoses of personality disorder, this court further recommends that upon remand, the ALJ consider personality disorder as part of her analysis of the materiality determination under 20 C.F.R. § 416.935.

### B. Other claims

Plaintiff also argues that the ALJ should not have relied upon her own opinion to evaluate the medical evidence, but instead should have consulted a medical examiner. (Pl.'s Br. at 26-27.) As plaintiff concedes in his reply brief, the ALJ is not required to consult a medical expert. Social Security regulations permit an ALJ to "ask for and consider opinions from medical experts on the nature and severity of [a plaintiff's] impairment(s)," and whether they equal the requirements of a listed impairment. 20 C.F.R. § 416.927(f)(2)(iii). However, to the extent that such consultation would assist the ALJ in determining whether plaintiff's

16

impairments equal the requirements of a listed impairment, the ALJ may avail herself of such assistance. See Diehl v. Barnhart, 357 F. Supp. 2d 804, 818 (E.D. Pa. 2005) (finding that the evidence in the administrative record was inconclusive on the issue of whether the plaintiff's impairments meet or equaled a listed impairment and remanding the case to require the ALJ to call upon a medical expert). See also Holmes v. Barnhart, 2007 WL 951637, at *11 (E.D. Pa. Mar. 26, 2007) ("Because the record contains evidence that fairly raises the question of whether Ms. Holmes suffered a Listing-level disability, and because the ALJ failed to explain his rejection of this evidence, thus inhibiting the Court from considering potentially valid reasons for discounting the evidence, the ALJ must order a consultative medical expert to adequately develop the record."). But see McGill v. Comm'r of Soc. Sec., 288 Fed. Appx. 50, 53 (3d Cir. 2008) (not precedential) (expert opinion evidence is not required when making a materiality determination under 20 C.F.R. § 416.935). The court recommends that on remand, the ALJ consider consulting a medical expert, but the ALJ is not required to do so.

Plaintiff also contends that the ALJ failed to give appropriate weight to the opinions of plaintiff's treating physicians. (Pl.'s Br. at 24-26.) A treating physician's opinion is entitled to controlling weight if it is consistent with the other substantial evidence in the record and is supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 416.927(d)(2). However, if substantial evidence in the record supports a conclusion contrary to that of the treating physician, the ALJ may reject the treating physician's findings. Frankenfeld v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988). "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting

17

explanations are provided." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985)). When rejecting a treating physician's opinion, "an ALJ may not make speculative inferences from medical reports," and may reject the opinion "outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotes and citations omitted).

In addition, while the Third Circuit has acknowledged that "greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant . . . [,] a statement by a plaintiff's treating physician that she is 'disabled' or 'unable to work' is not dispositive." Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994). Rather, "the ALJ must weigh the relative worth of a treating physician's report against the reports submitted by other physicians who have examined the claimant." Id. at 48. See Morales, 225 F.3d at 317 (explaining that the ALJ can choose whom to credit but cannot reject evidence for no reason or for the wrong reason). The Third Circuit has stated, "where there is conflicting probative evidence in the record, [there is] a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and [the court] will vacate or remand a case where such an explanation is not provided." Fargnoli, 247 F.3d at 42. As noted supra, treatment notes from plaintiff's treating physicians included diagnoses of, or at least likely diagnoses of, personality disorder(s). Consistent with the court's recommendation that the case be remanded for consideration of such evidence, the court further recommends that the ALJ properly weigh the reports of plaintiff's treating physicians against those of the consultative examiners and explain her reasons for rejecting or accepting such evidence.

18

## V. CONCLUSION

After a careful and thorough review of all of the evidence in the record, this court concludes that there is not substantial evidence to support the ALJ's determination whether plaintiff's impairments meet, equal, or are functionally equal in severity to a listed impairment. Thus, this court recommends that the request for review be granted so that the case can be remanded pursuant to sentence four of 42 U.S.C. § 405(g) to further develop the record in accordance with this Report and Recommendation.

**R E C O M M E N D A T I O N**

AND NOW, this 8th day of January, 2010, upon consideration of plaintiff's Brief and Statement of Issues in Support of Request for Review, defendant's response thereto, and plaintiff's reply, it is respectfully recommended that plaintiff's Request for Review be granted and this case be remanded for further proceedings consistent with this Report and Recommendation.[1]

BY THE COURT:

__/s/ Thomas J. Rueter_____
THOMAS J. RUETER
Chief United States Magistrate Judge

---

[1] Since the court recommends a remand pursuant to sentence four of 42 U.S.C. § 405(g), the court recommends that judgment be entered in plaintiff's favor. See Shalala v. Schaefer, 509 U.S. 292, 296-97 (1993) (Sentence four of 42 U.S.C. § 405(g) authorizes a district court to enter a judgment "with or without" a remand order, not a remand order "with or without" a judgment.) See also Kadelski v. Sullivan, 30 F.3d 399, 401 (3d Cir. 1994).